Good morning, Your Honor. I'm not known for nor given to brevity, so it was a bit of a shock to my system to find out that my sales were going to be trimmed on this argument. Your Honor, one of these days, maybe this day, the Ninth Circuit, perhaps in a regular panel or in bank or the Supreme Court, is going to address the question of the Ninth Circuit's standard for malicious prosecution claims in light of the Albright case in 1994. I've been pitching it since 1994 when I had a case here, a couple since. I believe that Albright case and the Hartman case that is discussed in most of the other circuits view the standard after Albright as being a pure Fourth Amendment reasonableness analysis, and that the special intent requirement that the Ninth Circuit imposed in malicious prosecution claims in the wake of the Peratt mess that existed in the mid-'80s, which has been superseded by a whole sequence of cases in the United States Supreme Court, which switched from the — THE COURT You're not known for clarity either, I gather. HILL No, I guess not. THE COURT Why don't you just go to what you want to say, giving us a whole history of — let's talk about your client and your case. HILL Yes. The Court decided — THE COURT What you should do in the remaining eight-and-a-half minutes is go to the claims sheet, go to your best claim and your best argument, and work your way down from there. HILL Your Honor, the district court decided the malicious prosecution claim under the Kelman-Usher test, not under the Albright test, which is what we urged, and consequently didn't address it in terms of strictly as a probable cause matter. The presumption on summary judgment is that all of the plaintiff's evidence is taken as true, and therefore everything that is contrary to that is not true. And the version of events between the plaintiff and the defendants are so diametrically opposed that if the plaintiff's version is deemed as true, then the defendant's version has to be deemed not only as untrue, but a falsification of the police reports that became the basis for the prosecution by the city attorney's office. So consequently, if that's the case, the — whatever basis you could argue that there was probable cause is wiped out by the mere — the falsity of the entire sequence of events that is presented in the police reports, which described her as violent from the get-go before the officers ever thought to arrest her, that she was kicking people before they ever commenced arrest. Now, we have significant evidence that was presented that that was not the case beyond the plaintiff's own testimony. You could just have been a mistake or an innocent misstatement if — I mean, let's say it was inconsistent. I mean, you need a deliberate lie, don't you? Excuse me? You need it to be a deliberate lie, don't you? No, I don't. You don't? I need a lack of probable cause. If the — if the police reports are falsified, in saying that she — When you say falsified, you don't — Or false. I use the word deliberate lie. I use the expression. You don't say — you use the word false. Correct. Is there a difference between them? Yes. It doesn't matter whether it's deliberate or not. If it's false, it's false. And if there was a decision to prosecute based on false information — If they make a mistake, then you can have a misprosecution claim. They just get it wrong. They misperceive or misremember when they prepare the report. Just a mistake. That's enough, in your view. I think that there's a Supreme Court case that addressed — Oh, no. I'm sorry. What was the question again? Is it enough or is it not enough? I'm trying to get you to believe me. If they make a negligent mistake? You know, I asked you a question. I don't want you to recharacterize my question. I want you to answer — I'm not clear about the question. Let's say they make a mistake. They remember incorrectly or they perceive incorrectly and they put down the facts inaccurately. If the truth would be an absence of probable cause, then there's a misprosecution claim. Even if it's just a mistake. That's your standard. If there's a mistake and the truth would mean an absence of probable cause, yes. If it's a mistake that's inconsequential, then no. Depends what the level of the mistake is. Well, not necessarily if it's consequential. If it's consequential and it's false, then that's correct. In fact, there's a Sixth Circuit decision that discussed the Ninth Circuit one and said that maybe we should rename malicious prosecution to unreasonable prosecution in light of Albright. And perhaps that's what needs to be done. And that's part of the problem here. But Albright does not discuss anything except for Fourth Amendment. Now, this is true of any Fourth Amendment case. If it's unreasonable, there's no intent requirement for Fourth Amendment cases. There is no authority for any intent requirement for a Fourth Amendment case. None whatsoever. Nor can I have I found any, nor has anybody cited any in this case. I thought there was an intent requirement for a violation of the civil rights. No. It's under the Davidson and Williams cases that corrected the Peratt problem. The court said you look to the individual constitutional amendment to determine whether there's an intent requirement. So there is an intent under the 14th Amendment, equal protection, due process. But under the Fourth Amendment, it just has to be unreasonable, lack of probable cause. So if we disagree with you on that, you lose. Yes. If you want to stick with Brett's versus Kelman and Usher, I lose. Now, likewise with the false arrest. You don't think there's room for you to argue that, in fact, the evidence here would support a jury inference of deliberate fabrication. And therefore, you should be allowed to go to the jury, even under an Usher theory, because the jury could look at the evidence and infer a malicious intent. I do believe that you can. It's not malicious intent. You have to. No, no, no. They intended. They deliberate. A constitutional violation. Falsified it. If you assume that the police reports were falsified, you can, from that, infer an intent that they intended to deprive her of due process of law. I think you just contradicted yourself. I did. So you take back what you said. You don't lose. I correct myself, yes. Sometimes it's good to listen to the question and ask, you know, before answering. This is true, Your Honor. Any other issues you wish to raise? The false arrest issue, the court did not properly consider the interplay of the First Amendment with the. You don't talk about deadly force at all? What's that? You don't talk about deadly force at all? Well, I was hoping to. But it looks like maybe I should switch to that. I guess I only have a choice between one or the other. The deadly force issue, I think, clearly, when I started that case, I was trying to do something. I don't want history. Why don't you talk to us about this case? I really don't want you. We haven't got enough time. Why don't you talk about the case? Yes, Your Honor. The deadly force issue was raised by the plaintiff in this case as a policy issue, as well as directly impacting what should be the standard for her damage claim. And we filed our own summary judgment motion, as well as defended against theirs. Under the Vera Cruz standard, we were in a very weak position. And under the Smith v. Kennedy position, we're in a very strong position. If the court had applied Smith v. Kennedy, of course it couldn't. But if it had done so, and applied the standard there on summary judgment, I believe we would have prevailed on summary judgment. And we would have prevailed on the defense of their summary judgment motion. And consequently, the whole configuration of the trial would have been different, because Smith v. Kennedy was an upward motion judgment.  And you would have traveled this time and guideline manually on any cases. deadly force cases. Before you even get to the Graham reasonableness test. You first consider what the quantum of force is. So you plot what's Smith v. Hamet. Correct. Kennedy, huh? Was that Kennedy? I'm sorry, Smith v. Hamm. Okay. So we can apply Smith, right? Yes. Why don't you talk about this case and where we are now, rather than giving us history. The judge said in the denying. We are, we are now here. We have a ninth circuit intervening and bank opinion. It says like a gift from God to you and you're down to zero seconds and zero minutes. And you haven't said a thing about it. This is a decision that came down after, after the district court decided the issue. It's in your favor and you all but ignore it. I didn't ignore it in my briefs and I couldn't discuss everything in the narrow time that I had. And I made a choice to discuss the things that I thought. Telling us that the district court couldn't apply. It doesn't tell us whether we can apply. Can we apply? Absolutely. You can. It's retroactive unless there's a reason to show otherwise. And no attempt has been made in this case to say why it should not. Well, maybe we'll hear the other side. Tell us why not. Okay. You're out of time. Good morning, Your Honor. Robert Walters, City Attorney's Office, San Diego. I'll start off with your question regarding the retroactive application of Smith. Do you agree that Smith is not helpful to you? If applied, we'd have to reverse. From a philosophical framework, I would agree. But Smith also talked about Smith was a dog, police dog case. And I'm sorry, I have no idea what it means from a philosophical framework. I'm sorry? I have no idea what a philosophical framework is. Okay. And frankly, I don't care. I'm asking only all my questions. You understand? And I think you can assume my colleague's question as well. I'm not about philosophy or anything else about this case and how it ought to be decided. Okay. So answer the questions with that in mind. Very good. The answer to your question is. The question is, Smith is convening in bank opinion that is contrary, it looks to me, to what the district court's ruling here was. So the question is, why shouldn't we reverse very quickly on the basis of Smith? Well, first of all, you shouldn't reverse on the basis of Smith, because Smith, which applied a police dog fact scenario, said, we are not saying that a police dog, use of a police dog, always constitute is per se deadly force. It could be deadly force, but it's not always deadly force. But so they leave it open. The corroded restraint could possibly, in unusual circumstances, be deadly force. But how was that issue decided here? How was that issue decided here? I think that the court applying Vera Cruz. How was it decided? What posture? It was not considered deadly force. The corroded restraint. That's a, was it a summary judgment? Was it a trial? I mean. Correct. It was the issue. The issue was, was, was brought up in summary judgment. Okay. You know how summary judgment works. Correct. Okay. You have to assume all the facts in their favor. And if you still win, assuming all the facts in their favor, then they don't get to trial. Okay. So, so if we now have an opinion that says it could be deadly force, it's something that has to be decided. Why don't they get a trial on that issue? It's very, very simple. Well, I, you know, Smith doesn't say it's always deadly force and they don't claim it's always deadly force. What they're saying is we want to have a jury decide whether it's deadly force in this case, whether it was appropriately used in this case. Sounds, sounds like that's what Smith requires. I mean, I. That's what the plaintiff wants, wants in this case. Yes. Well, he didn't manage to spit it out, but that's in fact what he wants. Correct. So, so tell me why not? Well, it seems entirely plausible. Yeah, the, at the time that this case was before the district court, the Veracruz rule was the, was applicable. I know, but they were wrong. You know, we, we now, the district court reasonably applied, relied on our precedent and that happens sometimes, you know, I, I, I've often relied on the Supreme Court precedent and then it turns out they were the reverse field. And I'm sure that Sandoval will have a chance to apply some of our cases that will later be reversed by Supreme Court and he'll say, wait a minute, what did I do wrong? So that's, that's a nice excuse, but for the district judge, but it doesn't matter. I mean, if the law is wrong today that the current applied, then why isn't that required reversal? Well, in this case, I think the court would have reached the same result under the Smith case. Okay. The, the bottom line here is the analysis of Judge Byrne's memorandum decision is that he did in fact give every benefit of facts in Ms. Acosta's favor. He looked at the, the way it was done, the, the testimony from experts from both sides, weighed everything in Ms. Acosta's favor and, and concluded. But he applied the wrong legal standard. So we don't know, I mean, you know, he, I have no doubt that Judge Byrne is a very fair judge and did a very scrupulous job of applying the facts, the laws that then existed. But the law changed. The law changed. You're, you're correct. Veracruz basically said likely to, likely to kill. Smith said substantial risk of death or serious bodily injury. And you can see where a fair-minded judge would take the same set of facts and say, this is not likely to kill. But now that I apply the new standard, which, you know, is a lower standard, I come to a different conclusion. But, but, but again, it's not divorced from the facts of the case. And the facts of this case were that this individual was resisting arrest. The police officer applied the corroded restraint. There's a dispute as to the facts as to whether she lost consciousness. There was no serious bodily injury in her case. You know, what we're, what would, what Appellant is really asking for is if there is even the remote possibility that serious bodily injury could result. Then that's deadly force. The problem. We know there's more than a remote possibility from, from that kind of hold. I mean, this is why it's no longer. Correct. You know, right. It's no longer used, is it? And that's probably an over-exaggeration on my part. The, where I'm going with this, Your Honor, is, is that you're talking about situations where police officers are required to make split-second decisions. That's police officer, in this particular case, was at a football game, a football game between the San Diego Chargers and the Oakland Raiders, which the police officer testified and Judge Burns acknowledged. These were highly volatile cases. More police presence is at these types of games because of fan fights and they have to be prepared for anything. So, so when you apply a serious bodily harm, yes, there's always a risk that any method, even, you know, a pain-creating method could produce a serious, serious injury in a situation where people get out of control. The particular individual gets out of control. Things are flying through the crowd. The objective is control. Trying to, to, to. Could he have simply shot her? I'm sorry? Could he have simply shot her? Could he have, with his gun? Yes, with his gun. Well, you know, that, that would certainly, that would certainly, you know, there would be no dispute about that being, that would be, there would be no dispute about that being deadly force, you know, and under that circumstance, the, the officer would. I'll remember that the next time you're up here. Could he have clubbed her? Could he have, could he have taken a club and knocked her over the head? Um, under a deadly force standard or an excessive force standard? I, you gave me a factual scenario. You said that he had to do anything that he needed to do to keep the coyote in check. All right. Could he have taken his club and he knocked her over the head, uh, until she, uh, you know, knocked her hard enough to, to knock her out? Could he have done that? No. The short answer is no. He could not have done that. Could he have twisted her arm behind the back to the point of breaking her shoulder? He possibly. He surely would have been able to do. I'm guessing from the size of the normal police officer and from what I gather is. Absolutely. Your Honor. He could have done that. He could have broken her arm. He could have broken her arm just simply by twisting her arm up. And that would have been okay. I think that would have been, would not have been certainly not been considered deadly force, but it certainly might've been considered excessive force under the circumstances. You don't think it's not, you don't think that she'd go to trial on whether that was excessive force? Well, I think she did go to trial on the excessive force issue. She did not go to trial on the deadly force issue. What judge Burns decided is the deadly force does not exist here. This is non deadly force. And what you're talking about with the arm behind the back also would be non deadly force. The, um, the club to the head that could possibly be deadly force, the guns, obviously deadly force. Um, but in this situation where you had non deadly force, the judge says, you know. Under these set of facts, I'm not certain. And I'm going to apply ninth circuit rules that say that we're not going to give summary judgment except in sparing situations. And so, so when, when we have a changing standard like this, what, what do we do with it? Do we then go back and apply the, the, the, the new standard to the, to the facts? Are we sending it back to the district judge to apply the new standard? What do we do in these situations? I think in this situation, I mean, I have a hard time concluding one way or the other as to whether a, um, what is this called? A chokehold? Corroded wristband. Corroded artery. Yes. Corroded wristband. That, that's the operative. It's not that it closes the windpipe, it's that it cuts off blood to the brain, right? Correct. That's the operative. Correct. I have sort of a hard time figuring out that this is, uh, uh, saying that this is not capable of causing death. So it's not, what, what, what was the Smith standard again? Well, the Smith standard is substantial likelihood of causing death or serious bodily injury, I believe. Substantial risk of death or serious bodily harm. And there is, there's no dispute. How do we decide that? I'm sorry? How do we decide that? Well, Your Honor, this, this is a good case. This is not a good case for, for retroactive application because, because in this case, as on its facts, you don't have. You, you, we're talking about something else. You're saying even if we do, it doesn't make any difference. And that's where we were. I don't want you to change analysis on me and say we shouldn't apply retroactively. I'm still talking about, let's say we do apply retroactively. You say it wouldn't make any difference. I'm trying to figure out how we do that. Well, how it would not make, because based, again, we have to look at the facts of this case. And the facts of this case do not reflect that even under a lower standard, that, that the, that the jury would have more likely come to a different conclusion as to whether deadly force was applied. You have a jury. That's not the summary judgment standard. This question is not more likely for the jury to. Okay. The question is, do they have a case to go to the jury? Remember, you got to keep that in mind. Do they have a case to go to the jury? And you are saying, if we look at everything he presented in the summary judgment, there would not be a case to establish your fact as to whether or not this mis-standard is, is, is met. And, and, and, and the reason. That's your position. That's my position. And the position is based on the facts of this case and the fact that the jury, when presented with an excessive force standard, which is a much lower standard than deadly force, concluded that the officers didn't act with excessive force. So I don't think that the result in this case would have changed had, had the deadly force issue gone to the jury. The jury may have pondered that, does this, you know, is there a possibility or substantial risk of causing serious bodily injury? I think the jury could have answered that question easily. Yes. Now, was, was deadly force applied in this case? I think the jury more than likely would have said no, because. Do you know what thank you means in this courtroom? I'm sorry? Do you know what thank you means in this courtroom? Yes. Thank you. If I give you a minute, do you want to, I'm not talking to you now, do you want to speak to the question of summary judgment and what you had there? Yes. And not limit, not go off on, on war stories. Go there for a minute. Tell us, tell us. Do you want to give this to Lutherford first or do you want to? He used up the time. I'm sorry, Your Honor. Your time is up. Who are you representing? I represent the Fenton's Elite Shelf Services, Blattner at a vacuum, Your Honor. And, and Williams and. Did you divide time with counsel? Had provided six minutes to counsel and reserved four hours. I guess he didn't give it to you. You may proceed. Your Honor, the, the test on summary judgment is obviously, as the court pointed out, all the intendants had to be presumed the expert. I know where the test is. Talk to me about the evidence. You got a minute. We, we presented expert evidence which said that it was a substantial risk, great bodily harm and or death and both medical and police expert. That was the gravamen of that evidence, as well as presenting the admitted evidence of everybody that the applicant, the carotid wasn't even applied correctly. So she was suspended by her head and her neck so that her whole body was dangling. She was in effect garroted. You make of counsel's argument that the jury doesn't even come back with an excessive force verdict. So how are they going to come back with a deadly, deadly force verdict? Well, because under Smith, the first test is the quantum of force and you don't get to the Graham reasonableness test unless you first look at the quantum force. And if there's deadly force, then the only, the deadly force is only permissible if there was deadly force from the suspect. And it was admitted in this case and in summary judgment and at trial that there was no deadly force by the suspect, by the plaintiff. So we would never get to the Graham test at all. So if the jury decided that the force used was not excessive, then what difference does it make? Well, she, the jury didn't get to hear the full scope of evidence because the judge severely limited the range of evidence on the question. So you weren't permitted to introduce evidence that she was basically held with her feet off the ground? Well, we were, but we were instructed. We couldn't call it deadly force. The, our, our expert was only allowed to say that it could cause death, not that it was a substantial risk of death. But the ultimate fact question was whether or not the force that was actually employed was excessive. So what difference does it make whether the jury was told that that might be considered deadly force if it ultimately concluded that whatever force was employed was not excessive? Because then the jury would have been instructed also to first look at whether it was deadly force. And then if the answer to that question is yes, then you don't get to the Graham reasonableness test where deadly force is undisputed. No, there was no deadly force by the suspect and that's undisputed. I guess what I'm really asking is why, why doesn't the jury's verdict collaterally stop you from re-litigating under this other theory when it has rendered a defense verdict, finding that whatever force was employed was not excessive? Because the jury didn't hear evidence that we could have presented that would have shown more substantially what the risk was. Experts that would have said how risky it was, what the, what the scope of the risk was, the jury was not instructed on it and was not told to first consider whether it was deadly force and to consider the fact that it was undisputed that it was not deadly force by the suspect. And we would still have to conclude to find damages that the force that was employed was excessive. What is no, you're saying you could get a verdict for the plaintiff simply by answering the question, the officer was not privileged to employ deadly force, therefore I'm damaged and I get money. Absolutely. That's what Smith says where it's undisputed that the plaintiff did not use deadly force. If the jury finds at step one under Smith, um, that the, uh, deadly force was used by the officer, that's the end of the inquiry. And Smith is very explicit about it. It cites from Chu on that subject. And it's very explicit that the first test. You'll have to find damage. Well, that's true, but you don't get to the reasonableness balance under Graham. If you first find that there was deadly force by the officer and no deadly force by the police, by the plaintiff. Okay. Thank you. Thank you for the amendment. I appreciate it. I'll give you a minute, but you know, stuff like that. We worked out with co-counsel and, uh, if you, uh, if he had time, uh, he should have, uh, have a good grace to tell us. Take a minute. Uh, but, um, Mr. Walters, if you are dividing time with somebody, you have a responsibility to let us know and you have a responsibility to stop talking when, when the time is up. Thank you, Your Honor. Uh, I make police court. I represent defendants, uh, at a Vladimir Adebekian, Donald Williams and elite show services, very distinct defendants from the city. Uh, just wanted to address a very fundamental point, Your Honor. It has, Your Honor. It goes to the issue of the falsity. Uh, the court raised the issue of whether the, the reports are false, um, and whether that's significant. I just wanted to point out, as far as my clients are concerned, Mr. Adebekian and Mr. Williams, reports are in fact, not false. The reports indicate that during the arrest, they were kicked by the appellant. Uh, that's a true statement. Everybody accepts. The court found that to be undisputed. Uh, there's also a characterization that somehow, uh, that's an incomplete version of the fact in that it's been characterized that the version of the fact Adebekian and Williams gave was that they were kicked prior to the time the carotid hold was applied by the police officers. Again, those reports, as tendered by my clients, the security guards to the police, did not state that. They didn't, they said nothing about a carotid hold. It did not say that the, um, that the kick occurred, uh, after the carotid hold was applied. I mean, before the carotid hold was applied, it simply said that they were kicked during the arrest. And so these statements by the guards were true. Thank you. Thank you, Your Honor. Case Society will stand submitted.
judges: Kozinski, Tallman, Sandoval